**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 29, 2019

BY ECF

The Hon. LaShann DeArcy Hall
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *United States v. Daniel Goodine*, No. 18 Cr. 390 (LDH)

Your Honor:

      This office represents Daniel Goodine in this felon in possession case. On October 2, 2018, Mr. Goodine pled guilty before Judge Kuo to the sole count of the indictment.

      Daniel Goodine, Jr. has the motivation, credibility, and institutional support to help keep young men away from violence in Brownsville. He has renounced his own gang allegiance, despite threats to himself and his family for doing so. He is a figure who commands tremendous respect, and is in a position to use that respect to help others avoid his fate. We seek a sentence that balances incremental punishment for Mr. Goodine's crime with his demonstrated potential to help his community.

      The government, by contrast, seeks a sentence near the statutory maximum, on the ground that Mr. Goodine is "terrifying" and should be incapacitated due to his gang affiliation. But there can be no serious dispute that Mr. Goodine has renounced that affiliation. He has told anyone who will listen about his decision and its fallout for himself and his parents, who will be present at sentencing and can corroborate his account. In light of Mr. Goodine's renunciation of his past, his criminal history cannot and should not be the sole driver of his sentence. Instead, we respectfully urge the Court to balance the need to punish Mr. Goodine for his crime with the needs of the community. If Mr. Goodine is locked up for ten years, young men will simply rise to take his place in the gang system.

      For these reasons, and for the additional reasons set forth below, we ask that Court to sentence Mr. Goodine to 36 months' incarceration, which is triple the amount of time he has already served on any of his prior convictions, and thus reasonable incremental punishment for

1

this gun possession crime. We also ask that Mr. Goodine, as a condition of his supervised release, be required to work daily with his father's neighborhood organization, or a similar organization, to help young men and boys in his community avoid his own fate.

Attached for the Court's consideration are letters from Mr. Goodine's father and stepmother, from his girlfriend Anikka Johnson, and from his close family friend Francena Smith.

**I.    BACKGROUND**

Daniel Goodine, Jr. was born and raised in Brownsville. His parents separated when he was young, and initially he lived with his mother. But that household was chaotic, the mother was inattentive, and Mr. Goodine experienced abuse from a babysitter. He was desperate to leave. It was therefore a relief when his mother relinquished custody to his father, Daniel Goodine, Sr.

Mr. Goodine, Sr. was a case worker at a local homeless shelter. He was dedicated to that job, and rarely home as a consequence. Mr. Goodine began to feel the pull of the streets as his peers in school began to be recruited by older gang members.

Mr. Goodine resisted for awhile, because he had positive influences too. He was by all accounts an accomplished football player for a local amateur team, the Mo Better Jaguars. The team kept him focused and off the corners for long stretches, as it was intended to do. *See* Albert Samaha, "Can Football Keep Young Boys Off Of Brooklyn's Toughest Streets?" *BuzzFeed News* (Aug. 30, 2018), *at* https://www.buzzfeednews.com/article/albertsamaha/football-keep-young-boys-brownsville-brooklyn-gangs.

Mr. Goodine, Sr. tried to maintain a positive environment for his son as well. He took him to Virginia for a year, where Mr. Goodine played football and thrived. But when the family moved back to Brownsville, and Mr. Goodine, Sr. remarried, Mr. Goodine succumbed to the streets and gang membership.

Mr. Goodine's life fell into a pattern of convictions, stints in jail lasting about a year or less, followed by more convictions, followed by similar periods in prison. The PSR reflects that the longest term Mr. Goodine has ever served is just over one year. (PSR ¶ 20; *compare* PSR ¶ 21 (eight months, followed by five months on parole revocation, followed by under thirteen months on second revocation); PSR ¶ 22 (just under nine months); PSR ¶ 23 (one year); PSR ¶ 24 (seven months); PSR ¶ 25 (six months).

Gangs and crime were not Mr. Goodine's only life. He also spent time with the Jaguars and other local sports teams for children, contributing equipment, volunteer coaching, and ensuring that games and practices would not be interfered with. More recently, Mr. Goodine organized several games among rival groups in the community, to encourage positive relationships, and he made sure to accompany the kids to and from those games to keep everyone safe.

Mr. Goodine's model, in this regard, was his father. Mr. Goodine, Sr. mourned the loss of his son to the streets, and he dedicated himself to helping other young men avoid a similar trajectory. He founded and ran the organization Men Elevating Leadership, providing programming, mentorship, and resources to at-risk young men, and recently was appointed to the advisory board of the Melting Pot Foundation and the Brownsville Community Culinary Center (an organization that employs several successful participants in the EDNY S.O.S. Program). *See* https://www.meltingpotfoundationusa.org/about/advisory/# (Biography of Daniel Goodine, Sr.).

It was therefore both a blessing and a curse when Mr. Goodine, Sr. learned that his son wanted to leave the gang lifestyle. Every young man who had grown up with Mr. Goodine was in prison for life, or dead. He had twins on the way. He needed to extricate himself. That decision led to a profound reconciliation between father and son. But it also led to danger. Mr. Goodine, Sr. and his wife experienced months of fear, because they learned that gang members had threatened them to punish Mr. Goodine for his decision.

## II.     APPLICABLE SENTENCING LAW

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)," which in turn sets forth that the applicable purposes are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution. In every case, the sentencing court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

The parties and Probation agree that the ACCA enhancement does not apply. The parties also agree, though Probation does not, that the four-point enhancement for possession with intent to commit another felony, U.S.S.G. § 2K2.1(b)(6)(B), does not apply, because Mr. Goodine did not in fact possess the firearm under the duress scenario he provided to the police. Indeed, that is why Mr. Goodine pled guilty to possessing the firearm, and the defense acknowledged that there

was no viable defense to the charge. Accordingly, the defense agrees with the government's Guidelines calculation of 92-115 months.

However, the government takes the sweeping position that virtually everything in Mr. Goodine's post-arrest statement is false (except, of course, his admission that he was part of a gang, his admission to knowingly possessing the firearm, and anything else helpful to the government). But that is not so.

For example, as discussed below, it is both true and corroborated that Mr. Goodine had renounced his gang membership, and that his father was being threatened as a consequence of that decision. Those facts are critical to this Court's consideration of whether a non-Guidelines sentence is appropriate. *See Pepper v. United States*, 562 U.S. 476, 490 (2011); *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (a sentencing court "has broad latitude 'to impose either a Guidelines sentence or a non-Guidelines sentence.'" (citation omitted)).

### III. ARGUMENT

1. Daniel Goodine, Jr. is uniquely positioned to improve his community in Brownsville. He is a respected former gang leader with deep credibility among the neighborhood's youth. He is newly reconciled with his father, himself a Brownsville institution who has spent years working to keep young men off the streets. And Mr. Goodine no longer has a peer group to lead him astray—all the men he grew up with are either dead or in jail for life.

There can be no serious dispute about Mr. Goodine's renunciation of his gang ties. As he explained to the police, to his parents, to his parole officer, and to anyone else who would listen, he made the final decision when he learned he would be the father of twins. (*See also* PSR ¶ 39 (corroborating account of Ms. Santiago that she "was pregnant with the couple's twins" at the time of Mr. Goodine's arrest)). Nor can there be a dispute about the fallout of that decision. Mr. Goodine's parents will be present at sentencing, and they are prepared to describe for the Court the months they spent in fear when they learned that gang-members had threatened them because of Mr. Goodine's decision to cut ties.

In light of that decision, the hardest time for Daniel Goodine will begin when he is released from prison. He will have no protection from former rivals, and he faces just as much potential danger from his former peers. So he will have to be brave, to walk a path of peace in the face of that danger.

Fortunately, Mr. Goodine has his father as a model and mentor. Mr. Goodine, Sr. is a towering figure in the community—as he can explain to the Court, he has the respect of gang-members, the police, and other community leaders. Mr. Goodine and his father have reconciled while he has been at the MDC, and Mr. Goodine will therefore not be on his own. He will have his father to model himself after, and his father's institution to work in.

There is no more important work. The shootings this past weekend in Brownsville are a vivid reminder of how lethal violence persists there, despite the best efforts of police and prosecutors. Real solutions to that violence demand people like Mr. Goodine, who have the

4

stature and influence to credibly work for change among the young men of the community. Simply locking Mr. Goodine away for a decade does nothing to fix the problem—other young men will simply rise to take his place.

For these reasons, we respectfully urge the Court to impose a sentence of 36 months, which amounts to triple the amount of time Mr. Goodine has ever previously served in prison. We also ask for a substantial term of supervised release, and a community service condition ensuring that Mr. Goodine will spend every day working with his father's organization, or a similar one, with youth in the community.

2. The government argues that a sentence at the top of the Guidelines, essentially the statutory maximum of 10 years, is warranted. But they offer no valid basis for such extreme punishment.

For example, the government writes that Mr. Goodine's criminal history demonstrates "beyond any doubt" that "he will not be deterred." (Gov't Letter at 5). But Mr. Goodine has renounced his gang membership, so his history of crime while in the gang previously says nothing about his capacity for deterrence going forward. The government suggests that Mr. Goodine's possession of a firearm is somehow inconsistent with his decision to "leave his gang" (*id.*), but the opposite is true. Just as Mr. Goodine's parents faced threats due to Mr. Goodine's decision, Mr. Goodine himself faced danger too. That does not excuse his decision to protect himself with an illegal gun, but it does explain it.

The government also suggests that Mr. Goodine should be given an enhanced sentence because Mr. Goodine was "an admitted gang leader," and his possession of a firearm in that capacity makes the offense more severe. (*Id.* at 4). But mere membership in a gang does not itself justify a sentencing enhancement under the Guidelines. *See United States v. Rivera*, 281 F. Supp. 3d 269, 273 (E.D.N.Y. 2017) (recognizing that "[t]he Guidelines do not consider gang membership as a factor in sentencing, except for defendants who are sentenced under 18 U.S.C. § 521 . . . where the Guidelines provide for an upward departure." (citation omitted)). It certainly does not justify an enhancement when Mr. Goodine *had renounced his gang membership* at the time of his arrest.

The government further argues that Mr. Goodine should be treated as a "*de facto*" armed career criminal—whatever that means—because he "has committed and has been convicted of at least three ACCA-eligible robberies." (Gov't Letter at 6). But the parties agree that Mr. Goodine is not ACCA-eligible. Nor is there any basis in law—and certainly none cited by the government—for using a notoriously unjust and oft-criticized mandatory minimum as a yardstick for an appropriate sentence in a case where it does not apply.

At bottom, the government's argument is that a long sentence is justified because Mr. Goodine's history is "terrifying." (*Id.* at 5). In other words, the government invites this Court to impose a sentence based upon fear. But justice does not come from fear. Rather, it comes from an appropriate balance of the statutory sentencing factors; a balance between punishing Mr. Goodine for his crime, on the one hand, and recognizing his capacity to do real good for his community, on the other.

5

3.      We do not seek a slap on the wrist for Mr. Goodine.  36 months is real time.  Critically, it is triple the amount of time Mr. Goodine has spent in prison for any of his prior offenses, and thus offers reasonable incremental punishment.  That 300% increase is particularly significant given the severity of the offense—what the parties agree was simply gun possession and nothing more.

The proposed sentence is reasonable for the additional reason that Mr. Goodine's time has been far harder than ordinary.  First, his twins died in a tragic premature birth while he was in prison.  He took the deaths badly—he was noticeably depressed for weeks, and could not focus on his case.  Mr. Goodine still has a hard time talking about what happened to his children.

Second, like many other inmates, Mr. Goodine experienced humane prison conditions during the MDC blackout.  No person deserves to be locked in the dark, freezing cold, without access to hot food, legal or family visits, or medical care, for days at a time, simply because of governmental neglect.  As Judge Furman commented in imposing a below-Guidelines sentence in *United States v. Ozols*, No. 16 Cr. 692 (JMF) (S.D.N.Y.), "it's pretty clear to me . . . that steps could have been taken, and taken more quickly, to address the problems [at the MDC].  And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC."  Mr. Goodine was suffering from a debilitating toothache at the time—he had no medical attention for the pain.

*       *       *

For the foregoing reasons, we urge the Court to impose a non-Guidelines sentence of 36 months, to be followed by an extensive period of supervised release, with the community service condition set forth above.

                                            Respectfully submitted,

                                            /s James Darrow

                                            James Darrow
                                            Assistant Federal Defender
                                            Tel. (718) 407-7419
                                            james_darrow@fd.org

                                            *Attorneys for Daniel Goodine*

cc:     Counsel of record (by ECF)
       U.S. Probation Officer Jennifer E. Baumann (by email)